**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| IN RE: THOMAS RALPH BURNS and HILDA COLLINS BURNS | CHAPTER 7 |
| DEBTORS | CASE NO. 18-03945-NPO |

**REBUTTAL IN SUPPORT OF TRUSTMARK NATIONAL BANK'S MOTION TO ABANDON AND FOR RELIEF FROM THE AUTOMATIC STAY**

Trustmark National Bank ("Trustmark") files this Rebuttal in support of *Trustmark National Bank's Motion to Abandon and for Relief from the Automatic Stay* (Dkt. # 30, the "Motion"), and in opposition to (a) *Trustee's Response to Trustmark National Bank's Motion to Abandon and for Relief from the Automatic Stay* (Dkt. # 36, the "Trustee's Response") filed by the duly appointed Chapter 7 Trustee (the "Trustee"); (b) the *Response to Trustmark National Bank's Motion to Abandon and for Relief from the Automatic Stay* (Dkt. # 40, the "Debtors' Response") filed by Thomas Ralph Burns and Hilda Collins Burns (together, the "Debtors"); and (c) *Merchant and Planters Bank's Response to Trustmark National Bank's Motion to Abandon and for Relief from the Automatic Stay* (Dkt. # 41, the "M&P Response") filed by Merchants and Planters Bank ("M&P"), as follows:

### Introduction

In its Motion, Trustmark demonstrated that cause exists to lift and terminate the automatic stay with respect to the Real Property Collateral[1] under Section 362(d)(1) because the Debtors cannot meet their burden of proving that Trustmark's interest in its Real Property Collateral is being adequately protected by any of the forms of adequate protection set forth in Section 361 of the Bankruptcy Code, *and* that the automatic stay should *also* be lifted and terminated with respect to the Real Property Collateral under Section 362(d)(2) because the

---

[1] Capitalized terms not defined herein are used as defined in the Motion.

Debtors do not have an equity in the Real Property Collateral and the Real Property Collateral is not necessary to an effective reorganization in this Chapter 7 Bankruptcy Case.

The Debtors' Response and the M&P Response (together, the "Responses") raise no substantive defenses to the Motion's allegations. That is, the Responses do not allege, much less demonstrate, that Trustmark's interest in the Real Property Collateral is being adequately protected, or that there is any equity in the Real Property Collateral, or that the Real Property Collateral is necessary to an effective reorganization.

Instead, the Responses generally allege that Trustmark did not loan the Debtors any money or give the Debtors any consideration in exchange for its security interest in the Real Property Collateral, and that Trustmark's security interest may be a fraudulent transfer and/or preference. But neither the Debtor nor M&P has standing to assert fraudulent-transfer or preference claims against Trustmark as such claims belong solely to the Estate. And the officer of the Estate with the sole authority to investigate and pursue such claims—the Trustee—has concluded that the Estate has no viable claim to seek avoidance of Trustmark's liens, and the Trustee therefore no longer opposes Trustmark's Motion.

Accordingly, the Responses should be overruled and Trustmark's Motion should be granted.

### Additional Relevant Facts and Procedural History

1. At all relevant times, the Debtors are and have been the owners, officers, and directors of A & B Equipment, Inc. ("A&B").

2. At various times, Trustmark has extended certain commercial loans to A&B, including (but not limited to) the following four commercial loans that Trustmark extended to A&B between May 2015 and February 2016:

| Loan # | Orig. Date | Orig. Principal Amt. | Collateral | Loan Documents Exhibit |
|---|---|---|---|---|
| 2635 | 5/28/2015 | $34,890.00 | 2007 Komatsu D39EX-21, S/N 2002; 6 Way Blade-OROPS-20" SBG Pads | "A" |
| 0113 | 11/19.2015 | $87,395.00 | 2013 Caterpillar 312EL Track Excavator S/N CAT0312ECMJD00612 | "B" |
| 0069 | 12/16/2015 | $35,170.00 | 2000 John Deere 450-H Dozer LGP, S/N 886475 | "C" |
| 1153 | 2/11/2016 | $50,170.00 | John Deere 450J Tractor S/N T0450JX106316 FOB Womelsdorf PA | "D" |

3.   Debtor Thomas Ralph Burns ("Ralph Burns") executed various *Commercial Guaranty* agreements in favor of Trustmark (collectively, the "Guaranties") personally and unconditionally guaranteeing to Trustmark the full and prompt repayment of all of A&B's indebtedness to Trustmark. True and correct copies of Guaranties executed in connection with the above-described A&B loans are attached hereto as collective Exhibit "E."

4.   A&B Loan 2635, A&B Loan 0113, A&B Loan 0069, and A&B Loan 1153 (collectively, the "A&B Loans") each were renewed from time to time in the ordinary course of business such that by mid-January 2018, each of the A&B Loans had maturity dates between March 5, 2018 and March 19, 2018.

5.   In February 2018, Trustmark agreed to provide the Debtors with a line of credit to be secured by a second mortgage on the Real Property Collateral, for the purpose of assisting the Debtors in their efforts to wind up the business of A&B, with the understanding that the proceeds of such line of credit would be used first to repay the outstanding A&B Loans owed to Trustmark.

6.   Thus, on or about February 23, 2018, the Debtors obtained Loan 7109 from Trustmark in the original principal amount of $175,686.50, and executed in favor of Trustmark the Deed of Trust granting Trustmark a second lien on the Real Property Collateral.

3

7. As of February 28, 2018, the outstanding balances of the A&B Loans from Trustmark were as follows:

|   |   |
|---|---|
| A&B Loan 2635 | $25,422.39 |
| A&B Loan 0113 | $76,655.96 |
| A&B Loan 0069 | $30,919.16 |
| A&B Loan 1153 | $38,217.72 |
| **TOTAL** | **$171,215.23** |

8. On February 28, 2018, proceeds from Loan 7109 totaling $171,215.23 were applied to pay off the A&B Loans, which Ralph Burns had personally guarantied.

9. On March 15, 2018, Trustmark disbursed additional proceeds from Loan 7109 in the amount of $3,636.99 and issued an Official Check to the Mississippi Department of Revenue ("MDOR") to satisfy State Tax Lien No. 893646 in the original amount of $3,580.55, which had been filed against Ralph Burns as a result of unpaid 2014 individual income tax.

10. Copies of the March 15, 2018 Official Check, the MDOR's Notice of Tax Lien, and the MDOR's Notice of Lien Cancellation are attached hereto as collective Exhibit "F."

11. On March 26, 2018, Trustmark filed with the Mississippi Secretary of State UCC-3 Financing Statement Amendments that terminated the initial financing statements that had been filed in connection with the above-described collateral, true and correct copies of which are attached hereto as collective Exhibit "G."

12. The Debtors initiated this Bankruptcy Case on October 12, 2018 (the "Petition Date"). Also on the Petition Date, the Debtors filed their *Schedules* and *Statement of Financial Affairs* (Dkt. # 3, the "Schedules").

13. In their Schedules, the Debtors alleged, *inter alia*, that:

    a. The Debtors held no "[c]laims against third parties" or "[o]ther contingent and unliquidated claims of [any] nature, including counterclaims of the debtor [or] rights to set off claims;"[2]

    b. Trustmark held a non-contingent, liquidated, and undisputed claim in the amount of $175,000 partially secured by a second lien on the Real Property Collateral;[3] and

    c. The Debtors intended to *reaffirm* their loan from Trustmark in the amount of approximately $175,000, partially secured by a second lien on the Real Property Collateral.[4]

14. Trustmark filed its Motion on December 11, 2018.

15. The Debtor's Section 341 meeting of creditors was held the next day, December 12, 2018 (the "Section 341 Meeting").[5]

16. At the Section 341 Meeting held the day after Trustmark filed its Motion, the Debtors alleged for the first time—and contrary to their sworn Schedules—that the Debtors received *no consideration* from Trustmark in connection with the security interest in the Real Property Collateral that the Debtors granted to Trustmark.

17. On December 17, 2018, the Trustee filed the Trustee's Response asking that the Motion be denied because the Trustee was at that time investigating whether Trustmark's liens on the Real Property Collateral and/or the Tractor Collateral were avoidable fraudulent transfers.

---

[2] Schedules at p. 7, questions 33–34.
[3] Schedules at p. 12, item 2.2.
[4] Schedules at p. 38.
[5] *See Proceeding Memo and Minutes of the Chapter 7 § 341 Meeting* (Dkt. # 33).

18. On December 27, 2018, the Debtors filed the Debtors' Response, generally alleging that the Debtors received no consideration from Trustmark in exchange for the security interests the Debtors granted to Trustmark in the Real Property Collateral and the Tractor Collateral, and suggesting that Trustmark's liens "appear to be the result of a fraudulent conveyance."[6]

19. On January 2, 2019, M&P filed the M&P Response alleging that Trustmark's liens "may constitute preferential transfers to a creditor,"[7] and objecting to the Motion "to the extent that the aforementioned transfer benefitted one creditor over other such creditors."[8]

20. On January 7, 2019, this Court held a hearing on the Motion and the Responses, and on the *Trustee's Motion for Continuance* (Dkt. # 42), following which the Court continued the hearing on the Motion and the Responses to January 28, 2019, and charged the Trustee to determine by that date whether the Estate would seek to avoid Trustmark's liens on the Real Property Collateral and the Tractor Collateral.

21. On January 23, 2019, this Court entered an *Agreed Order Withdrawing Trustee's Response to Trustmark National Bank's Motion to Abandon and for Relief from the Automatic Stay* (Dkt. # 66, the "Order Withdrawing Trustee's Response"), in which the Trustee advised that he "has now completed his investigation and has determined not to pursue avoidance of Trustmark's liens on either the Real Property Collateral or the Tractor Collateral,"[9] and accordingly withdrew the Trustee's Response.

22. On January 25, 2019, Trustmark, the Trustee, the Debtors, and M&P submitted to the Court a proposed *Agreed Order Granting Relief from the Automatic Stay as to a Certain*

---

[6] Debtors' Response at 2, ¶ 8.
[7] M&P Response at 1, ¶ 2.
[8] M&P Response at 2, ¶ 3.
[9] Order Withdrawing Trustee's Response at 2, ¶ 3.

6

*John Deere Tractor*, in which the parties stipulated that Trustmark's security interest in the Tractor Collateral is not avoidable, and agreed that the automatic stay may be lifted as to the Tractor Collateral and that the Tractor Collateral may be abandoned from the Debtor's Estate.

23. Thus, the only remaining issues in this matter are Trustmark's requests for relief in its Motion as to the Real Property Collateral, and the Debtors' Response and the M&P Response thereto.

## Discussion

### I. The Debtors and M&P Lack Standing to Assert Avoidance Claims Against Trustmark

It is well settled in the Fifth Circuit that "only trustees and debtors-in-possession, *not* creditors, have standing to invoke avoidance powers."[10] This is because Sections 547(b) and 548(a)(1) vest the power to avoid preferences and fraudulent transfers exclusively in "the trustee." And as the United States Supreme Court recognized when construing a similar grant of authority to "the trustee" in Section 506(c), "[w]here a statute names the parties granted the right to invoke its provisions, such parties only may act."[11] Thus, the Debtors and M&P have no standing to assert fraudulent-transfer or preference claims against Trustmark regarding its lien on the Real Property Collateral.

The Trustee—the only person with standing to assert such claims in this case—has thoroughly investigated the matter and has determined not to initiate Chapter 5 avoidance actions as to Trustmark's lien. Therefore, as a matter of law, such allegations asserted by the Debtors or by M&P are not cognizable defenses to the Motion.

---

[10] *In re Pointer*, 952 F.2d 82, 87 (5th Cir. 1992) (emphasis in original).
[11] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6-7, 120 S. Ct. 1942, 1947 (2000) (internal ellipses, square brackets, and quotation marks omitted).

**II.   Trustmark's Lien on the Real Property Collateral is not an Avoidable Preference**

Even if the Debtors or M&P *did* have standing to assert preference claims against Trustmark (which they do not), the preference allegation concerning Trustmark's lien on the Real Property Collateral is without merit as a matter of law.

Under Section 547(b)(4)(A), an essential element of a preferential transfer to a non-insider is that the transfer was made "on or within 90 days before the date of the filing of the petition."[12] It is undisputed that Trustmark's Deed of Trust on the Real Property Collateral was recorded on March 2, 2018, which was *225 days* before the Petition Date. Accordingly, Trustmark's Deed of Trust on the Real Property Collateral is not subject to avoidance under Section 547 as a matter of law.

**III.   Trustmark's Lien on the Real Property Collateral is not an Avoidable Fraudulent Transfer**

In general, a transfer is fraudulent and may be avoided under Section 548 of the Bankruptcy Code when the debtor had "actual intent to hinder, delay or defraud" a creditor, or when the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," and certain other indicia of "constructive" fraudulent intent are present.[13] And even if a transfer or obligation *is* avoidable under Section 548, a good-faith transferee or obligee for value "has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."[14]

---

[12] 11 U.S.C. § 547(b)(4)(A).
[13] 11 U.S.C. § 548(a).
[14] 11 U.S.C. § 548(c).

In this regard, Section 548(d)(2) specifically provides that the term "value" generally means "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ."[15]

Here, neither of the Responses alleges that the Debtors granted Trustmark security interests in the Collateral with "actual intent to hinder, delay or defraud" a creditor. Rather, the Responses allege that the Debtors received no consideration for the Deed of Trust they granted Trustmark, thereby implying that the Debtors did not receive reasonably equivalent value in exchange for the security interest provided to Trustmark.

But as set forth above and evidenced including by the attached Exhibits, the Debtors received *more* than reasonably equivalent value for the lien they granted Trustmark in the Real Property Collateral. Specifically, Trustmark issued the Debtors Loan 7109 in the amount of $175,686.50 in exchange for a second lien on the Real Property Collateral, which the *Debtors themselves* allege was worth only $170,000 as of the Petition Date.

Moreover, even *if* there were substantial equity in the Real Property Collateral (which there is not, according to the Debtors' own filings), Trustmark's second lien on the Real Property Collateral could never be worth *more* than the lawful indebtedness it secures, because the maximum "value" of a lien, by definition, is the amount of the secured indebtedness.

The United States District Court for the Western District of Virginia recognized this principle in *Callahan v. Osteen (In re Osteen)*, an appeal in a bankruptcy case in which the Chapter 7 debtors had obtained an approximately $150,000 loan but the lender lost and never recorded the deed of trust that was intended to secure the loan.[16] Some time later, the lender

---

[15] 11 U.S.C. § 548(d)(2).
[16] *Callahan v. Osteen (In re Osteen)*, No. 3:12-cv-00023, 2012 U.S. Dist. LEXIS 150484, at *3 (W.D. Va. Oct. 19, 2012).

9

filed a lawsuit to confirm its security interest in the property and the case settled with the debtors agreeing to give the lender a "Deed of Confirmation of Deed of Trust" and "Affidavit of Lost Instrument," which were then recorded.[17] The Debtors filed bankruptcy 100 days later.[18] The Trustee brought a fraudulent transfer action to avoid the deed of trust, and the contested issue was whether the lender had given reasonably equivalent value.[19] The bankruptcy court granted summary judgment in favor of the lender on all counts.[20]

On appeal, the district court affirmed in an opinion that collects and discusses authorities from numerous other jurisdictions, holding perhaps most notably that "most courts that have considered the question have determined that the securitization of antecedent debt will nearly always amount to reasonably equivalent value,"[21] and that under the facts of that particular case, "it is clear that the value of the Deed of Confirmation of Deed of Trust did not significantly exceed the $143,650 loan that the [debtors] received in 2009. No matter what the Bank attempted to do with its newly perfected security interest, it would never be able to obtain anything more than the debt proceeds for which its interest served as collateral."[22]

The *Osteen* court also noted that the trustee's arguments that the lender "was simply seeking to perfect an already securitized loan in an attempt to improve its position relative to other creditors," that "the transfer did not give the Bank any new security on the pre-existing debt," and that the transfer "simply reaffirmed an interest the Bank already possessed in an effort to gain priority over other creditors," were merely attempts "to transform a fraudulent conveyance claim under § 548(a) into a preference action under § 547(b)," likely "because there

---

[17] *Id.*
[18] *Id.* at *4.
[19] *Id.* at *7.
[20] *Id.* at *5.
[21] *Id.* at *9.
[22] *Id.* at *16.

10

is no question that the Deed of Confirmation of Deed of Trust was perfected more than ninety days before the Osteens filed for bankruptcy, and thus cannot be avoided under the preference statute . . . ."[23]

Indeed, as the Bankruptcy Court for the Southern District of New York has recognized:

To be sure, the payment of an antecedent debt, or a preference, reduces the assets available to other creditors. Nevertheless, if there is in our law one point which is more ungrudgingly accepted than others, it is that the preferential transfer does not constitute a fraudulent conveyance.[24]

Here, it is undisputed that the Debtors granted Trustmark a second lien on the Real Property Collateral, and by definition, that lien is only worth the indebtedness it secures. Because the securing of debt—even *antecedent debt*—constitutes "value" under Section 548(d)(2), the amount of the Debtors' indebtedness to Trustmark is the measure of *both* the maximum "value" of the lien Trustmark received *and* the "value" Trustmark gave in exchange for the lien. Accordingly, Trustmark's lien on the Real Property Collateral cannot be a fraudulent transfer as a matter of law.

**WHEREFORE,** Trustmark respectfully requests that this Court enter an Order that overrules the Responses, grants the Motion, and:

a. lifts, terminates, and annuls the automatic stay of 11 U.S.C. § 362 as to the Debtors with respect to the enforcement of Trustmark's liens and interests in the Real Property Collateral so as to permit Trustmark to:

   i. repossess, foreclose, or otherwise realize upon the Real Property Collateral;

---

[23] *Id.* at *16-17.
[24] *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) (internal quotation marks omitted).

      ii. bring an action in state or federal court as may be necessary to put Trustmark and/or persons acting on its behalf in full and complete possession of the Real Property Collateral; and

      iii. take any and all other actions consistent with repossession or foreclosure of the Real Property Collateral to either maintain or liquidate the Real Property Collateral;

b. abandons the Real Property Collateral from the bankruptcy estate of the Debtors;

c. waives the fourteen (14) day stay of execution of Federal Rule of Bankruptcy Procedure 4001(a)(3); and

d. directs that any grant of relief to Trustmark is and shall be applicable to any subsequent case filed by or against the Debtors under the Bankruptcy Code or upon the conversion of this case to any other Chapter under the Bankruptcy Code.

Trustmark further prays for general relief.

**THIS** the 25th day of January, 2019.

                                  Respectfully submitted,

                                  **TRUSTMARK NATIONAL BANK**

                                By: /s/ Christopher H. Meredith
                                    William H. Leech, MSB No. 1175
                                    Sarah Beth Wilson, MSB No. 103650
                                    Christopher H. Meredith, MSB No. 103656
                                    Shauncey G. Hunter, MSB No. 109185
                                    *Its Attorneys*

OF COUNSEL:
Copeland, Cook, Taylor & Bush, P.A.
600 Concourse, Suite 100
1076 Highland Colony Parkway (Zip—39157)
P.O. Box 6020
Ridgeland, MS  39158
Telephone: (601) 856-7200
Facsimile:  (601) 856-7626
bleech@cctb.com
sbwilson@cctb.com
cmeredith@cctb.com
shunter@cctb.com

## CERTIFICATE OF SERVICE

Service provided via Notice of Electronic Filing (NEF) through ECF:

*Les Alvis;*
*Joe S. Deaton;*
*Derek A. Henderson;*
*Robert T. Higginbotham, Jr.;*
*Karen A. Maxcy;*
*J. Walter Newman, IV;*
*Douglas C. Noble;*
*Jeff D. Rawlings;*
*Eileen N. Shaffer;*
*Stephen Smith;*
*J. Wilbourn Vise;*
*Jeffrey M. Williams;*
*Jacob C. Zweig; and*
*Office of the US Trustee.*

**THIS** the 25th day of January, 2019.

/s/ Christopher H. Meredith
Of Counsel